THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| REBECCA BRANDI-VANMETER, on behalf of herself and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MP2 ENTERPRISES, LLC; BRYANT PETERSON; LAYNE PETERSON; DOE CORPORATION 1-10; JOHN DOE 1-10,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [30] PLAINTIFF'S MOTION FOR RULE 23 CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT**<br><br>Case No. 4:23-cv-00081-DN-PK<br><br>District Judge David Nuffer |

## INTRODUCTION

Plaintiff Rebecca Brandi-Vanmeter, on behalf of herself and others similarly situated, filed a Motion for Rule 23 Class Certification and Memorandum in Support ("Motion to Certify").[1] Ms. Brandi-Vanmeter argues that she, and 147 others similarly situated persons, either are, or were, employees of Defendants MP2 Enterprises (owned and managed by Defendants Bryant Peterson and Lance Peterson, collectively referred to as "MP2"), and MP2 "willfully" failed to pay the required minimum wages in violation of the Fair Labor Standards Act ("FLSA").[2]

MP2, in response, relies on the central argument that Rule 23's threshold requirements cannot be met because employees are "bound by an arbitration agreement that requires arbitration and waives an employee's right to join a class action."[3] Additional briefing and

---

[1] Docket no. 30 filed January 5, 2024.
[2] *See id.*; *see also* Complaint, 13, ¶¶ 90, 93, docket no. 1, filed September 27, 2023.
[3] Defendants' Response to Plaintiff's Motion for Rule 23 Class Certification ("MP2's Response to the Motion to Certify") at 3–7, docket no. 35, filed February 2, 2024; *see also* Defendants' Amended Additional Briefing on the

precertification discovery has been necessary and has extended the briefing schedule for the Motion to Certify. Having reviewed the additional briefing, and for the reasons explained below, Ms. Brandi-Vanmeter's Motion to Certify[4] is GRANTED.

**Table of Contents**

INTRODUCTION ............................................................................................................................ 1
BACKGROUND ............................................................................................................................ 2
DISCUSSION ................................................................................................................................. 5
    1.      The Arbitration Agreements ................................................................................ 6
        1.1     Applicability of the Original Arbitration Agreement to MP2 ................... 8
        1.2     Class Communications and Applicability of the Post-Litigation Arbitration Agreement ................................................................................................ 9
    2.      Rule 23 Threshold ............................................................................................... 14
        2.1 Numerosity ............................................................................................. 16
        2.3 Commonality .......................................................................................... 16
        2.3 Typicality ............................................................................................... 17
        2.4 Adequacy ............................................................................................... 17
        2.5 Predominance and Superiority under Rule 23(b)(3) .............................. 18
CONCLUSION .............................................................................................................................. 18

**BACKGROUND**

The district court conditionally certified the collective action after the parties stipulated on May 15, 2024,[5] and Ms. Brandi-Vanmeter's counsel sent notice to those who satisfied the collective-action class definition (more specifically, defined as "delivery drivers who have worked at MP2' Pizza Hut stores dating back three years prior to the filing of the complaint[, September 27, 2023]").[6] Even if class certification is granted, potential class members still must opt-in to the class.[7] "Under the FLSA . . . 'conditional certification' does not produce a class

---

Issue of Arbitration Agreements & Communication with Putative Class ("MP2's Amended Additional Briefing"), docket no. 67, filed April 28, 2025.
[4] Docket no. 30.
[5] Order Granting Conditional Certification of FLSA Collective Action, docket no. 39, filed May 15, 2024.
[6] *Id.*; *see also* Notice of Consents, docket nos. 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 68.
[7] 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

with an independent legal status, or join additional parties to the action. The sole consequence of conditional certification is the sending of court-approved written notice to employees . . . ."[8]

"Unlike class actions under Rule 23," the FLSA requires class members to opt-in to the class and directs that "[n]o employee shall be a party plaintiff to any such [FLSA class] action unless [they] give[ their] consent in writing to become such a party and such consent is filed in the court in which such action is brought."[9] Including the original named Plaintiff (Ms. Brandi-Vanmeter) 148 delivery drivers consented to opting-in to the class.[10]

In response to the notices of consent, and Motion to Certify, MP2 objected to certification arguing that the "putative class, except Plaintiff, ha[d] signed arbitration agreements where they agreed to binding arbitration and waived their rights to join a class action."[11] Other than an unsigned arbitration agreement, MP2 did not provide any of the arbitration agreements as evidence of this defense.[12] The unsigned arbitration agreement is a two-page document that includes both an English and Spanish version of the arbitration agreement.[13] Significantly, the English version lists MP2, while the original Spanish version lists Pizza Hut and its affiliates.[14] The English version lists: "MP2 Enterprises, LLC and MP2 Alaska, LLC on behalf of itself and its parents and affiliates, officers and directors (collectively, 'MP2')."[15] The Spanish version

---

[8] *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013).
[9] *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001). Despite involving the ADEA and not the FLSA, the Tenth Circuit explains that the ADEA borrowed the similarly situated standard from the FLSA: *Id.* "Arguably, the ad hoc approach is the best of the three approaches outlined because it is not tied to the Rule 23 standards. Congress clearly chose not to have the Rule 23 standards apply to class actions under the ADEA, and instead adopted the 'similarly situated' standard. To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 (either the current version or the pre 1966 version) would effectively ignore Congress' directive." *Id.*
[10] Notice of Consents, docket nos. 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 68.
[11] MP2's Response to the Motion to Certify at 1, docket no. 35, filed February 2, 2024.
[12] *Id.* at Exhibit 1.
[13] *Id.*
[14] *Id.*
[15] *Id.*

then replaces MP2 with "Pizza Hut, Inc."[16] Without any arbitration agreements to review, and this clear discrepancy, precertification discovery of the 147 delivery drivers and their associated arbitration agreements was ordered.[17]

On February 13, 2025, MP2 produced the arbitration charts by state (Arizona, Utah, and Nevada—notably, none were provided for Alaska) of employees with the following information: date of signature, employment start and end dates (month/year), and the exhibit associated to the employees' signed arbitration agreement.[18] After receipt of the arbitration agreements, on February 24, 2025, Ms. Brandi-Vanmeter filed her Motion to Set Briefing Schedule on the Impact of Defendants' Pre-Certification Discovery Production on Plaintiff's Motion for Class Certification.[19]

Ms. Brandi-Vanmeter also requested even further briefing on the impact of the Arbitration Exhibits to address the following: (1) all arbitration agreements signed prior to this lawsuit were between the employee and "Pizza Hut, Inc." ("Original Arbitration Agreement");[20] (2) then, after the complaint was filed, the parties to the arbitration agreement were changed to "MP2 Enterprises, LLC and MP2 Alaska, LLC," despite MP2's original representations[21] that all employees signed Exhibit 1 to their response to the Motion to Certify ("Post-Litigation Arbitration Agreement"); [22] (3) further discovery is necessary to demonstrate MP2's affiliate status to Pizza Hut, Inc., therefore extending the arbitration agreements signed before litigation

---

[16] *Id.*

[17] Memorandum Decision and Order for Precertification Discovery of the Arbitration Agreements ("Order for Precertification Discovery"), docket no. 51, filed January 16, 2025.

[18] Arbitration Agreement Charts for Nevada, Utah, and Arizona Employees, docket no. 54, filed February 13, 2025 (collectively these charts are referred to as the "Arbitration Exhibits"); *see also* Defendants' Response to Plaintiff's Motion to Set Briefing Schedule, docket no. 59, filed March 3, 2025.

[19] Docket no. 55.

[20] *Id.*

[21] *See* MP2's Response to the Motion to Certify at 2 at ¶¶ 3–6, docket no. 35.

[22] Plaintiff's Motion to Set Briefing Schedule on the Impact of Defendants' Pre-Certification Discovery Production on Plaintiff's Motion for Class Certification at 2–3, docket no. 55, filed February 24, 2025.

to MP2; and, (4) abusive class communications may have occurred in acquiring all of the arbitration agreements signed after litigation had begun.[23] Notably, the Post-Litigation Arbitration Agreement's Spanish version still includes Pizza Hut and not MP2, like the English version does.

There were other problems noted in the arbitration agreements.[24] Therefore, further briefing by the parties was ordered, with Defendant specifically ordered to provide the following:

> Defendants' opening brief shall address and include, but is not limited to, the following: (i) the franchise agreement or other supporting documentation of Defendants' affiliate status with Pizza Hut; (ii) supporting evidence of Defendants policies and procedures during its hiring process; (iii) process and procedures for sending and collecting arbitration agreement signatures (including software/website used for sending and storing the executed arbitration agreements); and (v) any other relevant and responsive information pertaining to communications with potential class members [25]

Defendants filed their additional briefing on April 28, 2025, and Plaintiff's responded on May 15, 2025.[26]

## DISCUSSION

The Motion to Certify argues that the potential class has met "all of Rule 23's requirements for class certification."[27] MP2 disagrees and argues that the Rule 23 requirements cannot be met because of the arbitration agreements executed by the potential class members.[28]

---

[23] *Id.*
[24] *Id.*; *see also* Memorandum Decision and Order Granting in Part and Denying in Part Plaintiff's Motion to Set Briefing Schedule on the Impact of Defendants' Precertification Discovery ("Order for Additional Briefing") at 6, docket no. 61, filed March 28, 2025. For instance, all of the Defendants' employees who had not signed the newer version of the arbitration agreement (except Ryan Putnam) were terminated in September 2023, which required more explanation. *Id*. Among other issues, there were also two employees who began their employment with Defendants in February 2014 who signed over ten years later after litigation began: Aaron Bolton, who signed on April 17, 2024, and Steven Vandermeide, who signed June 4, 2024. *Id.*
[25] Order for Additional Briefing at 6, docket no. 61, filed March 28, 2025.
[26] MP2's Amended Additional Briefing, docket no. 67; *see also* Plaintiff's Response to Defendants' Additional Briefing Regarding the Enforceability of Arbitration Agreements ("Plaintiff's Response to Additional Briefing"), docket no. 69, filed May 15, 2025.
[27] Plaintiff's Response to Additional Briefing at 14, docket no. 69, filed May 15, 2025.
[28] Response to the Motion to Certify at 3–8, docket no. 35.

The fundamental issue is whether the arbitration agreements are enforceable. Specifically, do the arbitration agreements entered into with Pizza Hut extend to MP2, as an affiliate of Pizza Hut; and then, whether the arbitration agreements solicited after litigation began are enforceable.

### 1. The Arbitration Agreements

"Although the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA), 'strongly favors enforcement of agreements to arbitrate, a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit.'"[29] However, if an enforceable agreement is found, "then necessary to determine 'who is bound by the agreement and whether the agreement covers a particular controversy.'"[30] In this case, MP2 relies on the existence of such an agreement to prevent certification of the class.

MP2's contends that its "standard business practice is to have every new and existing employee of MP2 sign an Arbitration Agreement."[31] MP2 argues that all of the potential class members identified by Plaintiff for Rule 23 class certification are required to submit to arbitration under the FAA.[32] Accordingly, MP2 argues that all potential class members identified by Ms. Brandi-Vanmeter for Rule 23 class certification are required to submit their claims to arbitration under the FAA. As an example, and attached to Defendant Bryant Peterson's Declaration, was an unsigned but declared "true and correct copy of the Arbitration Agreement that every new and existing company employee is required to sign . . . ."[33] Accordingly, MP2 assert that under the attached arbitration agreement employees must arbitrate all disputes

---

[29] *Fucci v. First Am. Title Ins. Co.*, No. 24-4051, 2025 WL 2609718, at *4 (10th Cir. Sept. 10, 2025) (quoting *Hill v. Ricoh Ams. Corp.*, 603 F.3d 766, 777 (10th Cir. 2010)).
[30] *Id.* (quoting *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023)).
[31] *Id.* at Exhibit A, ¶ 8; *see also* Arbitration Exhibits, docket no. 54 (noting that there are at least six employees who did not sign upon hiring.)
[32] MP2's Response to the Motion to Certify at 2, ¶¶ 2–3, docket no. 35, Exhibit A, Declaration of Defendant Bryant Peterson, Manager of MP2 Enterprises, LLC and its subsidiaries at 2, ¶ 8.
[33] *Id.* at Exhibit A, Declaration of Defendant Bryant Peterson, Manager of MP2 Enterprises, LLC and its subsidiaries, 2 ¶ 8.

regarding "any claims . . . . concerning wages, expense reimbursement, compensation, leave, employment . . . ."[34]

The key difference between the pre and post litigation agreements is who the employee is agreeing to arbitrate with. In the Original Arbitration Agreement employees enter into an agreement with "Pizza Hut, Inc. . . and its parents and affiliates, officers and directors (collectively, 'Pizza Hut')."[35] By contrast, in the Post-Litigation Arbitration Agreement employees enter into an agreement with "MP2 Enterprises, LLC and MP2 Alaska, LLC and its parents and affiliates, officers and directors (collectively, 'MP2')."[36] Again, it is notable that the Spanish version of the Post-Litigation Arbitration Agreement was never changed but has always referred to Pizza Hut. Central to the parties' dispute is whether the Arbitration Exhibits listing Pizza Hut extend to MP2, and those signed after litigation expressly naming MP2, are valid and enforceable between MP2 and its employees.[37]

MP2 acknowledges that the Original Arbitration Agreement does not expressly name them as a party, but argues that they are considered "affiliates" of Pizza Hut.[38] In support of this assertion, MP2 provided in precertification discovery their franchise agreement with Pizza Hut.[39] Relevant state general contract laws apply to the Arbitration Exhibits.[40] Here, it is undisputed that Arizona, Nevada, and Utah law applies.[41] When interpreting contracts—in Arizona, Utah, and Nevada—the courts first look to the plain language within the four corners of the

---

[34] *See generally* Arbitration Exhibits, docket no. 54.
[35] MP2's Response to the Motion to Certify, docket no. 35, Exhibit A-1, Unsigned Arbitration Agreement.
[36] *Id.*
[37] *Compare* Plaintiff's Response to Defendant's Additional Briefing at 13, docket no. 69; *with* MP2's Amended Additional Briefing at 4–6, docket no. 67.
[38] MP2's Amended Additional Briefing at 4, docket no. 67,.
[39] *Id.* at Exhibit A.1 ("Franchise Agreement").
[40] *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).
[41] *See generally* Plaintiff's Response to Defendant's Additional Briefing, docket no. 69; *see also* MP2's Amended Additional Briefing, docket no. 67.

7

document.[42] For the reasons stated below, neither version of the Arbitration Exhibits is valid and enforceable against the potential class members.

### 1.1 Applicability of the Original Arbitration Agreement to MP2

In its Amended Additional Briefing, MP2 relies on the general definitions of "affiliate" and "control" found in Arizona, Nevada, and Utah's corporation statutes, asserting that the Franchise Agreement contains provisions demonstrating Pizza Hut's control over MP2's operations, finances, and corporate structure that are sufficient to establish an affiliation."[43] MP2 does not cite to any case law supporting this assertion.[44] And a review of the Franchise Agreement provisions identified by MP2 do not plainly refer to MP2 as an affiliate nor the requisite control to establish affiliate status.[45] In fact, the opposite is true, MP2 is defined as an "Operator" and a "licensee" of Pizza Hut, while referring to Pizza Hut and its "affiliates" are described as separate from MP2:[46]

For instance, when outlining the reasons for default, the Franchise Agreement states: "[The] Operator's failure, refusal, or neglect promptly to pay any monies owing *to Company, its subsidiaries and affiliates*, when due, or to submit the financial or other information required by Company under this Agreement."[47] Then, for purposes of indemnification MP2, as the, "Operator[,] agrees to protect, indemnify, and *save Company, its affiliates, subsidiaries, . . .* from any and all loss, damage, liability, or attorney's fees and costs incurred by any of them owing to

---

[42] *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993); *Fed. Nat'l Mortg. Ass'n v. Westland Liberty Vill., LLC*, 138 Nev. 614, 619, 515 P.3d 329, 334 (2022); *Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716.
[43] Docket no. 67 at 2, 5.
[44] *See generally id.*
[45] *Id.* at Exhibits A.1–A.3 (e.g. in Exhibit A.1: "The assignor has executed a general release under seal, in a form prescribed by Company, of any and all claims against Company, its affiliates, subsidiaries, shareholders, directors, officers, and employees.").
[46] *Id.* at Exhibit A.1 at 1, 24, 25, 27, 29, 32.
[47] *Id.* at 29, Article XIX(C)(1) (emphasis added).

claims which arise directly or indirectly from or in connection with Operator's operations under this Agreement."[48] Therefore, a plain reading of the Arbitration Exhibits, when considered together with the Franchise Agreement, demonstrates that MP2 is not an "affiliate" of Pizza Hut; is not a party to the Original Arbitration Agreement; and therefore cannot enforce its terms against its employees.

### 1.2   Class Communications and Applicability of the Post-Litigation Arbitration Agreement

As to the Post-Litigation Arbitration Agreements, MP2 was ordered to produce "any other relevant and responsive information pertaining to communications with potential class members."[49] This order was intended, in part, to clarify several irregularities observed in the Arbitration Exhibits and Post-Litigation Arbitration Agreements—namely, that a substantial number of employees who had *not* signed the new arbitration agreement were terminated on the same date (September 2023, the same month the Complaint was filed), while others who *had* signed the new agreement appeared to have done so *after* their employment had already been terminated.[50] In response to the request for additional briefing, MP2 submitted two exhibits: (1) a declaration from MP2's manager, Bryant Peterson, and (2) a new spreadsheet showing that "employee separations occurred over a broad time period, not concentrated in September 2023."[51] The Order for Precertification Discovery was also intended to fetter out whether the class communications were misleading, improper, or coercive.

MP2's manager, Bryant Peterson, in his declaration explained that "[a]ll current employees identified in [a review of the arbitration agreements] have since signed arbitration

---

[48] *Id.* at 36, Article XXV.
[49] Order for Precertification Discovery, docket no. 61, filed January 16, 2025.
[50] *Id.*
[51] MP2's Amended Additional Briefing, docket no. 67.

9

agreements as a matter of Company policy."[52] Mr. Peterson further explains that this "was done to ensure consistency in onboarding practices and not to influence this lawsuit in any way."[53] Yet, this action departs from MP2's consistent and normal practices, and until this lawsuit employees had never signed arbitration agreements with MP2 before, only Pizza Hut.[54]

he additional spreadsheet, attached as Exhibit 2 to Peterson's Declaration, MP2 explains that the "September 2023" date "merely reflects the date when MP2 transitioned from using its first version of the arbitration agreement to the updated version."[55] The source of this spreadsheet is not explained nor are the dates included for when the employee signed the agreements.[56] However, a review of the spreadsheet alongside the previous Arbitration Exhibits demonstrate continued abnormal peculiarities.

For instance, the only three Arizona employees who signed the Post-Litigation Arbitration Agreement signed well after they were terminated.[57] Kaden Yellowhorse signed the Post-Litigation Agreement on January 16, 2024, but according to Exhibit 2 he was employed from September 6, 2022, to June 12, 2023, (different from what was previously provided, which was October 2023 to the present).[58] Similarly, Maira Castro signed March 15, 2024, but according to Exhibit 2 she was employed from January 11, 2023, to June 12, 2023, (different from what was previously provided, which was also October 2023 to the present).[59] And employee, Nataanii Aquila, signed May 10, 2024, over seven months after his employment

---

[52] *Id.* at 1, Declaration of Defendant Bryant Peterson, Manager of MP2 Enterprises, LLC and its subsidiaries, ¶18.
[53] *Id.*
[54] *See id.*
[55] *Id.* at Exhibit 2.
[56] *See e.g., id.* at Arbitration Agreement Charts for Arizona Employees, Exhibit 6, Kaden Yellowhorse (signed almost six months after employment was terminated).
[57] *Compare* MP2's Amended Additional Briefing, docket no. 67, Exhibit 2; *with* Arbitration Agreements, Arizona Charts.
[58] *Id.*
[59] *Id.*

ended with MP2.[60] These peculiarities are not limited to the Arizona employees but extend to the Utah and Nevada Post-Litigation Agreements.[61]

With regards to class communications, Mr. Peterson describes that "[a]fter the lawsuit was filed, I did inform managers of MP2's various locations about the existence of the lawsuit."[62] There is no other detail given as to the scope of these discussions or their substance. Accordingly, in response, Ms. Brandi-Vanmeter provided email communications with counsel from June 2024 asserting that managers had been informed by Mr. Peterson that the case was a "joke" and filed by a "disgruntled employee."[63]

The Tenth Circuit explains that "courts can use Rule 23(d) to restrict inappropriate communications from counsel to putative class members."[64] The Tenth Circuit, like other circuits, follow the Supreme Court's guidance on this issue in *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981).[65] The Supreme Court states in *Gulf Oil co. v. Bernard*, "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."[66]

"Once conditional certification is granted, communications with the putative class are not prohibited 'where a party has not engaged in misleading, coercive, or otherwise abusive communications.'"[67] To determine when to restrict communication with putative class members,

---

[60] *Id.*
[61] *Id.*
[62] *Compare* MP2's Amended Additional Briefing, docket no. 67, Exhibit 2; *with* Arbitration Agreements (*e.g.,* Nevada employee, Timothy McKibbin, signed his agreement almost two years after his employment ended; among others; Utah employee, Aaron Bolton, signed a month after his employment ends in April 2024; among others.).
[63] Plaintiff's Response to Defendant's Additional Briefing, docket no. 69, Exhibit 1.
[64] *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, n.3, 1204 (10th Cir. 2016).
[65] *Id.*
[66] *Id.*
[67] *Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1105 (D. Colo. 2013) (quoting *Longcrier v. HL–A Co., Inc.,* 595 F.Supp.2d 1218, 1227 (S.D.Ala.2008)).

courts evaluate the evidence of actual or threatened abuse by the party sought to be restrained.[68] In other jurisdictions, "Courts have issued restrictive orders where it is found that the *ex parte* communications 'mislead[ ] class members,' 'misrepresent[ ] the status or effect of the pending action,' 'coerce prospective class members into excluding themselves from the litigation,' or 'undermine cooperation with or confidence in class counsel.'"[69] This is so because "after the Court authorizes a notice in a[n FLSA] case, the Court has an interest that no defense communication undermine or contradict the Court's own notice."[70]

"[A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."[71] In *Gulf Oil*, the Supreme Court explained that the district court's broad authority to exercise control over the class action under Rule 23 is "not unlimited," and must "embody carefully drawn orders that limits speech as little as possible, consistent with the rights of the parties under the circumstances."[72] "[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."[73]

MP2 admits that after litigation had begun, but consistent with longstanding policy, employees who had not signed the arbitration agreements were asked to sign arbitration agreements.[74] MP2 did not provide a written policy; just Mr. Peterson's declaration stating that a policy exists.[75] MP2 also admits that through Mr. Peterson managers were "inform[ed]" but that

---

[68] *Id.*; see also *Kleiner v. First Nat. Bank of Atlanta,* 751 F.2d 1193, 1205 (11th Cir.1985).
[69] *Id.* (quoting *Bass v. Pjcomn Acquisition Corp.,* 2011 WL 902022 (D.Colo. Mar. 14, 2011)).
[70] *Id.* (quoting *Parks v. Eastwood Ins. Servs., Inc.,* 235 F.Supp.2d 1082, 1085 (C.D.Cal.2002)).
[71] *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 (1981).
[72] *Id.* at 102.
[73] *Id.*
[74] MP2's Amended Additional Briefing, docket no. 67, 7, Exhibit 1, ¶¶ 10, 17–18
[75] *Id.* at Exhibit 1, ¶ 18.

the communications "were minimal, limited to notifying managers, with no discussions involving frontline employees except two with family ties."[76] Mr. Peterson also admits to discussing the litigation with his "son and a close friend," both of whom are employees of MP2.[77] MP2 argues that the content of these discussions are unobjectionable because they were "unrelated to this litigation" and "in line with long standing companywide policy."[78] MP2 also admits to "transition[ing] from its first version of the arbitration agreement to the updated version," and does not dispute that the only transition was to replace Pizza Hut in the English Version to list MP2.[79]

This process of obtaining op-outs through potentially ex parte communications before certification, and after notice was sent, unquestionably frustrates the purpose of the class action mechanism. By MP2's own admissions, all potential class members identified after litigation had begun were contacted and approached about signing the newer Post-Litigation Arbitration Agreement.[80] Mr. Peterson's April 2025 declaration, the parties' briefing, and the precertification discovery there has been a compelling showing that the Post-Litigation Arbitration Agreements are misleading, improper, confusing, and coercive communications. There is a satisfactory basis for the relief sought by Ms. Brandi-Vanmeter in excluding those arbitration agreements signed after this lawsuit had initiated the class action process.

Therefore, with the limited information provided by MP2 with regards to the substance and context of the class communications, MP2 shall refrain from any further communication

---

[76] *Id.* at Exhibit 1, ¶ 20.
[77] *Id.* at Exhibit 1, ¶ 19.
[78] *Id.* at Exhibit 1, ¶ 19.
[79] *Id.* at 10.
[80] *Id.* at 7 and Exhibit 1, ¶¶ 10, 17–18

with Opt-in Plaintiffs regarding this lawsuit, until after the opt-in period has closed. This adequately balances maintain fair proceedings in this action with First Amendment concerns.

On the one hand, Ms. Brandi-Vanmeter has demonstrated that Mr. Peterson's communications with opt-in Plaintiffs may unduly pressure them to enter into the Post-Litigation Arbitration Agreement and thereby dropping out of the collective action. But on the other hand, MP2 and their authorized agents may still communicate about matters outside of this action with the opt-in and putative opt-in Plaintiffs that currently are employed by them, just not about this lawsuit. A less restrictive order would not adequately protect the collective action's purposes. And, in any event, this order's duration is limited.

### 2. Rule 23 Threshold

The FLSA permits "[a]n action to recover [unpaid minimum wages]. . . against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."[81] "Though 'similarly situated' is not defined by the FLSA, district courts must determine who is similarly situated in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure."[82] The Tenth Circuit has noted there are "three different approaches district courts use to determine who is similarly situated: the *ad hoc* approach, the Rule 23 approach, and the spurious approach."[83] Ms. Brandi-Vanmeter's Motion to Certify seeks class certification under the Rule 23 approach.[84]

---

[81] 29 U.S.C. § 216(b).
[82] *In re Chipotle Mexican Grill, Inc.*, No. 17-1028, 2017 WL 4054144, at *1 (10th Cir. Mar. 27, 2017) (internal citations and quotation marks omitted).
[83] *Id.*
[84] Motion to Certify at 1.

"For a class to be certified under Rule 23, a party must show that the four threshold requirements of Rule 23(a) are satisfied and that one of the three provisions of Rule 23(b) is satisfied."[85] The requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable [numerosity];
> (2) there are questions of law or fact common to the class [commonality];
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
> (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].[86]

"In other words, the class must demonstrate the requisite *numerosity, commonality, typicality, and adequacy* to proceed with a class action."[87] Certification of a class lies within the discretion of the trial court.[88] The Tenth Circuit clarifies that "[w]hen addressing class certification, the district court must undertake a 'rigorous analysis' to satisfy itself that the prerequisites of Rule 23 of the Federal Rules of Civil Procedure are met."[89] If the threshold is met, then the class must satisfy one of the three alternative class-types under Rule 23(b).[90]

"First, Rule 23(b)(1) addresses situations where 'incompatible standards of conduct for the party opposing the class" would arise without class treatment.'"[91] "Second, Rule 23(b)(2) covers class actions for declaratory or injunctive relief where the party defending against the class 'has acted or refused to act on grounds that apply generally to the class.'"[92]

Third, as is the case here, "Rule 23(b)(3) is available where 'questions of law or fact common to class members predominate over any questions affecting only individual members,

---

[85] Fed. R. Civ. P. 23 (a)–(b).
[86] *Id.*
[87] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).
[88] *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).
[89] *Id.*
[90] *Id.*
[91] *Id.* (quoting Fed. R. Civ. P. 23 (b)(1)).
[92] *Id.* (quoting Fed. R. Civ. P. 23 (b)(2)).

15

and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"[93] "In other words, class status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation."[94] The Tenth Circuit explains that "so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately."[95]

Here, the proposed class satisfies each of the four requirements under Rule 23(a) — numerosity, commonality, typicality, and adequacy—and the class further meets the predominance and superiority standards required under Rule 23(b)(3).

### 2.1 Numerosity

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. Here, Defendant employs or has employed dozens—if not hundreds—of individuals in positions subject to the same pay policies and practices challenged by the named Plaintiff. Given the size of number who have consented (148 with plaintiff included), plus, the transient nature of some employees' positions, and the geographic dispersion of class members, joinder of each individual plaintiff would be impracticable. Numerosity has been satisfied.

### 2.3 Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. This requirement is satisfied when "the class members' claims depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." The central issue here—whether Defendant's compensation policies and

---

[93] *Id.* (quoting Fed. R. Civ. P. 23 (b)(3)); *see also Brayman*, 83 F.4th at 838.
[94] *CGC Holding Co.*, 773 F.3d at 1086 (emphasis in original).
[95] *Brayman*, 83 F.4th at 838 (10th Cir. 2023) (quoting *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019)).

practices violated the FLSA by failing to pay employees minimum wage—is common to all proposed class members. Each member's claim arises from the same uniform policies and timekeeping procedures, cost keeping mechanisms, and their entitlement to unpaid wages turns on the same legal and factual determinations. Accordingly, commonality is satisfied.

### 2.3 Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative party be typical of those of the class. Typicality is met when the representative's claims arise from the same course of conduct that gives rise to the claims of other class members and are based on the same legal theory. Ms. Brandi-Vanmeter's claims are typical because, like the other class members, she was subject to Defendant's uniform wage and hour practices. She alleges that she, like her coworkers, was not properly compensated as a delivery driver once all costs associated with the job are taken into account. Thus, her claims are not only similar but identical in legal theory to those of the proposed class.

### 2.4 Adequacy

Rule 23(a)(4) requires that the representative party fairly and adequately protect the interests of the class. This requirement focuses on two questions: (1) whether the named plaintiff and her counsel have any conflicts of interest with other class members, and (2) whether the named plaintiff and her counsel will prosecute the action vigorously on behalf of the class. Ms. Brandi-Vanmeter's interests are fully aligned with those of the class—she seeks recovery for the same statutory violations and under the same factual circumstances. Her counsel has experience and expertise in wage-and-hour and class action litigation. Together, they will adequately represent the class's interests.

**2.5 Predominance and Superiority under Rule 23(b)(3)**

In addition to meeting Rule 23(a), the class satisfies Rule 23(b)(3) because common questions predominate over individual ones, and a class action is the superior method for adjudicating the controversy. The core issues—whether Defendant's policies systematically resulted in unpaid work and whether those policies violated the FLSA—predominate over any individual variations in damages. The resolution of these common issues in a single proceeding will promote efficiency and consistency of outcomes, avoiding the burden of repetitive individual suits. Given the relatively small value of individual claims, class treatment is also the superior and most practical means of providing relief to the employees.

Accordingly, Ms. Brandi-Vanmeter has satisfied the rigorous analysis required under Rule 23, and class certification is warranted.

## CONCLUSION

Based on the foregoing, the Motion to Certify[96] is GRANTED. Further, MP2 shall refrain from any further communication regarding this lawsuit with Opt-in Plaintiffs, until after the opt-in period has closed.

Signed November 17, 2025.

BY THE COURT

David Nuffer
United States District Judge

---

[96] Docket no. 30 filed January 5, 2024.